# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

|  |  |
|---|---|
| MICHAEL MEANS, individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiff, |  |
| v. | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| EVERYDAY HEALTH, INC., DOUG McCORMICK, BEN WOLIN, HABIB KAIROUZ, DAVID GOLDEN, SHARON WIENBAR, MYRTLE POTTER, DANA EVAN, LAIZER KORNWASSER, ZIFF DAVIS, LLC, PROJECT ECHO ACQUISITION CORP., and J2 GLOBAL, INC., | **JURY DEMAND** |
| Defendants. |  |

---

Plaintiff Michael Means ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

## SUMMARY OF THE ACTION

1.     Plaintiff brings this class action on behalf of the public stockholders of Everyday Health, Inc. ("Everyday Health" or the "Company") against Everyday Health's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(e) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), for breach of fiduciary duty, for aiding and abetting said breaches of fiduciary duty, and to enjoin the expiration of a tender offer on a proposed transaction, pursuant to which Everyday Health will be acquired Ziff Davis, LLC ("Ziff")

through Ziff's wholly-owned subsidiary, Project Echo Acquisition Corp. ("Merger Sub"), guaranteed by j2 Global, Inc. ("j2 Global" or the "Guarantor") (collectively with the Individual Defendants, the "Defendants") (the "Proposed Transaction").

2.      On October 21, 2016, Everyday Health announced the definitive Agreement and Plan of Merger (the "Merger Agreement") pursuant to which each outstanding common share of Everyday Health will be exchanged for $10.50 per share in cash or a transaction value of approximately $465 million (the "Proposed Transaction" or "Merger").  The Proposed Transaction is structured as an all-cash tender offer, which requires a simple majority of Everyday Health shares to be tendered to Ziff by the close of the offer period.

3.      Defendants have agreed to lock up the Proposed Transaction with deal protection devices that preclude other bidders from making a successful competing offer for the Company. Specifically, pursuant to the Merger Agreement, Defendants agreed to: (a) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even from continuing discussions and negotiations with potential acquirers; (b) a termination fee of up to $15,180,000 payable by Everyday Health to Ziff under certain circumstances, including the sale of the Company to another bidder; and (c) a "matching rights" provision that allows Ziff to match any competing proposal in the event one emerges.  These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursing superior proposals.

4.      Additionally, the process leading up to the Proposed Transaction may have been tainted by the self-interest of certain of the Individual Defendants.  Significantly, Directors Doug McCormick ("McCormick") and Habib Kairouz ("Kairouz") are both affiliated and employed at Rho Ventures, the largest stockholder of the Company (collectively, "Rho Ventures").  Kairouz, in particular, owns nearly 4 million shares of Company stock.  Notably, Kairouz and McCormick,

through their affiliation with Rho Ventures, actively sought out different compensation for themselves and Rho Ventures by seeking to collaborate with interested potential parties in a potential buyout of the rest of the Company.  This position, which they held for a substantial portion of the sales process of the Company, is evidence that Kairouz, McCormick, and Rho Ventures sought to use their positions within the Company to extract greater consideration in any potential strategic alternative for themselves.

5.     Additionally, in connection with the transactions contemplated by the Merger Agreement, the vesting of all unvested options and unvested restricted stock units of the Company will be accelerated to be vested in full converting millions of dollars of currently illiquid stock into cash for certain Directors and Insiders of the Company.  Furthermore, several Everyday Health Directors and officers have lucrative change-in-control, or "golden parachute" clauses in their employment contracts, which, when triggered by their termination due to the consummation of the Proposed Transaction, will result in payment to them of, at the very least, hundreds of thousands of dollars.

6.     In the Solicitation/Recommendation Statement filed by the Company on Schedule 14D-9 with the SEC on November 2, 2016 (the "Recommendation Statement"), Defendants failed to disclose all material information necessary for Everyday Health's stockholders to make an informed decision regarding the Proposed Transaction.  Specifically, the Recommendation Statement omits and/or misrepresents material information concerning, among other things: (1) the background of the Proposed Transaction; (2) the data and inputs underlying the financial valuation exercises that purportedly support the so-called "fairness opinions" provided by Everyday Health's financial advisor, Qatalyst Partners ("Qatalyst"); and (3) Everyday Health's financial projections, relied upon by Qatalyst.  The failure to adequately disclose such material

information constitutes a violation of Sections 14(e) and 20(a) of the Exchange Act as stockholders need such information in order to make a fully-informed decision regarding tendering their shares in connection with the Proposed Transaction.

7.      Notably, as evidenced by the Recommendation Statement, the sales process leading up to the Proposed Transaction was a haphazard and poorly run process, wherein prospective bidders were allowed to submit bids on different schedules and in which the "Transaction Committee" created to advise the Board regarding the process was a mere formality with no real function.  Said process was further hampered by the decision of two of the Directors, McCormick and Kairouz, to actively attempt to capitalize on the situation for their own purposes.

8.      Absent judicial intervention, the Merger will be consummated, resulting in irreparable injury to Plaintiff and the Class.  This action seeks to enjoin the unreasonable steps taken by the Defendants in entering into the Merger Agreement without fully disclosing all material information concerning the Proposed Transaction to Plaintiff and the Company's stockholders.  To remedy defendants' Exchange Act violations, Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such problems are remedied.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as this Complaint alleges violations of Rule 14(e) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange Act.

10.     Venue is proper in this Court because the Defendants reside, are found, have agents and regularly transact business in this District as provided in 28 U.S.C. § 1391(b) and (c). Everyday Health is headquartered in this District.  Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within

this District.

## PARTIES

11.     Plaintiff is a resident of the State of Georgia who has been, at all relevant times, the owner of shares of Everyday Health common stock.

12.     Defendant Everyday Health is a corporation organized and existing under the laws of the State of Delaware.  Everyday Health maintains its principal corporate offices at 345 Hudson Street, 16th Floor, New York, NY 10014.   The Company operates digital marketing and communications platform for healthcare marketers primarily in the United States. It designs its health content for consumers and healthcare professionals to access anytime and anywhere and to be distributed across various platforms comprising online content, interactive tools, and applications. The company also enables consumers to manage their daily health and wellness needs; healthcare professionals to stay informed and make decisions for their patients; and marketers, health payers, and providers to communicate and engage with consumers and healthcare professionals to drive health outcomes. It delivers its content and solutions through various channels, including desktop, mobile Web, and mobile phone and tablet applications, as well as video and social media. The Company operates Everyday Health, What to Expect, Mayo Clinic Diet, MedPage Today, My Calorie Counter brands. It serves pharmaceutical companies, manufacturers and retailers of over-the-counter products, consumer-packaged-goods, and healthcare providers, as well as approximately 350 hospitals in 30 states. The company was formerly known as Waterfront Media Inc. and changed its name to Everyday Health, Inc. in January 2010.  Shares of Everyday Health common stock are traded on the New York Stock Exchange ("NYSE") under the symbol "EVDY."

13.     Defendant Doug McCormick ("McCormick") has served as a director of the Company since March 2003.  In addition, Chan serves as a member of the Board's Compensation

and Nominating and Governance Committees.   Notably McCormick is the Chairman of Rho Capital Partners, Inc., an affiliate of Rho Ventures, the largest stockholder of the Company.

14.     Defendant Ben Wolin ("Wolin") is a Co-Founder of the Company has served as a director of the Company since its inception in 2002.  In addition, Wolin serves as the Company's Chief Executive Officer ("CEO"), a position he has held since the Company's inception.  Wolin owns over 1.3 million shares of the Company, approximately 4% of the outstanding shares of the Company.

15.     Defendant Habib Kairouz ("Kairouz") has served as a director of the Company since March 2003.  In addition, Kairouz serves as the Chair of the Board's Nominating and Governance Committee.  Furthermore, Kairouz holds nearly 14% of the stock of the Company through Rho Ventures, an affiliate of Rho Capital Partners, Inc.  As such Kairouz will be granted a substantial payday upon the consummation of the Proposed Transaction which will not be shared among Plaintiff and the public stockholders of the Company.

16.     Defendant David Golden ("Golden") has served as a director of the Company since February 2009.  In addition, Golden serves as a member on the Board's Audit and Nominating and Governance Committees.

17.     Defendant Sharon Wienbar ("Wienbar") has served as a director of the Company since August 2007.   In addition, Wienbar serves as the Chair of the Board's Compensation Committee and as a member of the Board's Audit Committee.

18.     Defendant Myrtle Potter ("Potter") has served as a director of the Company since July 2007.  In addition, Potter serves as a member on the Board's Nominating and Governance Committee.

19.     Defendant Dana Evan ("Evan") has served as a director of the Company since

October 2009.  In addition, Evan serves as the Chair of the Board's Audit Committee and as a member on the Board's Compensation Committee.

20.     Defendant Laizer Kornwasser ("Kornwasser") has served as a director of the Company since July 2015.  In addition, Kornwasser serves as a member of the Board's Audit Committee.

21.     Defendants referenced in ¶¶ 13 through 20 are collectively referred to as Individual Defendants and/or the Board.

22.     Defendant Ziff, is a Delaware limited liability company whose principle place of business is at 28 East 28th Street, New York, NY 10016.  Ziff, a digital media company, engages in the digital publishing of content in gaming, technology, and men's lifestyle categories.  It operates PCMag.com, an online brand that provides laboratory-based product reviews, technology news, buying guides, and more for technology buyers; IGN.com, an online source of gaming and entertainment content for 18-34-year old men; and AskMen.com, a men's lifestyle site that serve audience directly in the United States, Canada, the United Kingdom, and Australia, as well as through licensed editions in Germany, Turkey, and the Middle East.  Ziff is a subsidiary of Defendant j2 Global, Inc.

23.     Defendant Merger Sub is a Delaware corporation and wholly owned subsidiary of Ziff that was created for the purposes of consummating the Proposed Transaction.  It can be served care of its agent for service of process, Incorporating Services, Ltd., at 3500 S DuPont Hwy, Dover, DE 19901.

24.     Defendant j2 Global is a Delaware Corporation and parent of Ziff, with headquarters at 6922 Hollywood Blvd., Suite 500, Los Angeles, CA 90028.  j2 Global, Inc., engages in the provision of Internet services worldwide. It operates through two segments,

Business Cloud Services and Digital Media. The Business Cloud Services segment offers cloud services to sole proprietors, small to medium-sized businesses and enterprises, and government organizations, as well as licenses its intellectual property rights to third parties. This segment provides online fax services under the eFax and MyFax names; on-demand voice and unified communications services under the eVoice and Onebox names; online backup solutions under the KeepItSafe, LiveDrive, and LiveVault names; hosted email security, email encryption, and email archival services under the FuseMail name; email marketing service under the Campaigner name; and cloud-based CRM solutions under the CampaignerCRM name. The Digital Media segment operates a portfolio of Web properties, including PCMag.com, IGN.com, Speedtest.net, AskMen.com, and TechBargains.com that offers technology products, gaming and men's lifestyle products and services, news and commentary related products and services, speed testing for Internet and network connections, and online deals and discounts for consumers, as well as professional networking tools, targeted emails, and white papers for IT professionals. This segment also sells display and video advertising on its owned-and-operated Web properties and third party sites, as well as targeted advertising across the Internet through various networks; sells business-to-business leads for IT vendors; promotes deals and discounts on its Web properties for consumers; and licenses the right to use PCMag's Editors' Choice logo and other copyrighted editorial content to businesses.  Defendant j2 Global is publicly traded on the NasdaqGS under the ticker symbol "JCOM."

## <u>SUBSTANTIVE ALLEGATIONS</u>

### *Company Background*

25.     Everyday Health operates digital marketing and communications platform for healthcare marketers primarily in the United States. It designs its health content for consumers and healthcare professionals to access anytime and anywhere and to be distributed across various

platforms comprising online content, interactive tools, and applications.

26.    The Company also enables consumers to manage their daily health and wellness needs; healthcare professionals to stay informed and make decisions for their patients; and marketers, health payers, and providers to communicate and engage with consumers and healthcare professionals to drive health outcomes. The Company delivers its content and solutions through various channels, including desktop, mobile Web, and mobile phone and tablet applications, as well as video and social media.

27.    The Company operates Everyday Health, What to Expect, Mayo Clinic Diet, MedPage Today, My Calorie Counter brands. It serves pharmaceutical companies, manufacturers and retailers of over-the-counter products, consumer-packaged-goods, and healthcare providers, as well as approximately 350 hospitals in 30 states.

28.    Everyday Health has a demonstrated history of financial success, recently evidenced by its Q2 2016 financial results that were announced in an August 4, 2016 press release. Notably, the company saw total revenue grow 5% year-over-year, an increase in advertising and sponsorship revenue of 7% year-over-year, and Pharma revenue growth of 8% year-over-year.

29.    Speaking on these positive results, Brian Cooper, Company Chief Financial Officer ("CFO") stated, "We are pleased with the progress with our core pharma customers, and remain encouraged by the strong growth in our hospital SaaS revenue and our demonstrated ability to drive incremental advertising dollars from those customers."

30.    These successes did not go unnoticed by those in the media either; for example, an August 11, 2016, *Capital Cube* article notes that the Company's "earnings number is sustainable".

31.    Moreover, an August 8, 2016, *Seeking Alpha* article penned by Darspal S. Mann titled "Everyday Health Is Just Getting Started" noted that the Company had, "[g]ood quality

9

enviable assets in the healthcare space offering different engagement tools, data & analytics and CRM to consumers and physicians." Mann went on, noting that the Company "seems to be making a consistent progress on positioning the business to monetize the favorable trends."

32.     Additionally, on September 2, 2016, *Zacks* upgraded the Company to their highest rank, a "Strong Buy" – a move which was primarily driven "by the Company's strong second-quarter 2016 results". Further comments came from *Zacks*, which released a September 20, 2016 article that praised the Company's stock for a 7% rise on the day.

33.     Everyday Health has displayed impressive financial results, not only recently, but also consistently for some time, establishing the Company as consistently profitable. For example, on May 5, 2016, the Company announced its Q1 2016 financial results that saw, amongst other things, record revenue growth. Specifically, the company saw an increase of total revenue of 34% year-over-year, an increase in Advertising and sponsorship revenue of 41% year-over-year, Pharma revenue growth of 38% year-over-year, and an Adjusted EBITDA increase of a ***staggering 625%*** year-over-year.

34.     Speaking on these successful results, CFO Cooper stated, "The strong revenue and Adjusted EBITDA results in Q1, which significantly exceeded the guidance we provided earlier this year, are very encouraging. We are very pleased with the performance across our consumer, professional and payer/provider units." The Company CFO continued praising the Company's incredible growth in the quarter by stating, "Our consumer advertising has returned to growth, our professional business is performing extremely well and our payer/provider business is meeting all the milestones we have set for this very large, new opportunity."

35.     Company CEO and Co-Founder Wolin also heaped praised on Everyday Health's Q1 performance, stating, "We are extremely pleased with our first quarter results as revenue and

Adjusted EBITDA were both record highs for the quarter."  Wolin would continue, and opine on the extremely positive future growth the Company was likely to expect given these results, stating, "The macro trends for our business remain quite positive, and our future growth can be powered by a diverse set of customers across the healthcare sector that are all seeking to engage and influence consumers and healthcare professionals."

36.     Looking even further back one can see that the Company has been financially sound for some time.  In its Q4 and full year 2015 financial results released on May 1, 2016, the Company noted such financial milestones for the year such as total revenue growth of 26% from the previous year, a revenue increase from the top 30 strategic advertisers of 30% year-on-year, a similar 30% increase year-on-year for pharma revenue generated by the Company, and, notably, an increase of 27% in EBITA for the year.

37.     The Company also reported positive results for the fourth quarter, with total revenue growth of 30% as compared to Q4 2014, year-on-year revenue growth of 42% from its top 30 strategic advertisers, a similar 28% year-on year growth from pharma revenue, and an adjusted EBITDA increase of 39% from Q4 of 2014.

38.     Speaking on these extremely positive results, Defendant Wolin noted, "In 2015, we made great strides in building the leading marketing platform for the healthcare sector… We dramatically expanded our market opportunity, diversified our customer base and invested in our sales capabilities to better serve our customers. We now provide innovative solutions to pharma companies, CPG marketers, hospital systems and health insurers, and we can help all of these customers achieve their most important strategic objectives."

39.     Speaking more specifically on the Company's financial successes, CFO Cooper stated, "We delivered record results in 2015, with total revenue and Adjusted EBITDA each

growing in excess of 25% over 2014," continuing, "The strategic investments we have made will drive further growth in 2016, and we remain confident in our ability to achieve our long term growth and profitability targets."

40.     Those in the media were quick to note the Company's success, with the *Associated Press* noting in a March 1, 2016 article that the Company had "exceeded Wall street expectations".

41.     Clearly, Everyday Health has been a financial success for some time, however, the Proposed Transaction does not take this into account, and if consummated will deprive Plaintiff and other public stockholders of the Company of the proper value of their investment.

**The Flawed Process Leading to the Proposed Transaction**

42.     In late 2015, an individual investor ("Individual Investor") contacted Defendant Wolin, on an unsolicited basis, expressing an interest, potentially in conjunction with one or more other investors, in making a potential significant minority equity investment in Everyday Health, including through the purchase of newly-issued Shares from Everyday Health and secondary Shares from Everyday Health's existing stockholders.   From December 2015 through October 2016, members of Everyday Health management engaged in discussions with Individual Investor, individually and subsequently together with a private equity investor ("Institutional Investor") that joined Individual Investor in presenting a proposed offer to Everyday Health, regarding a potential minority equity investment.

43.     In mid-2015, Ziff CEO Vivek Shah ("Shah") and Ziff Chief Strategy Officer James Yaffe ("Yaffe") met with Wolin to discuss whether Everyday Health management had any interest in pursuing a transaction with Ziff.

44.     On March 22, 2016, a privately held digital health company ("Strategic A"), together with its private equity owner ("Financial A") and an unaffiliated financial sponsor

("Financial B" and, together with Strategic A and Financial A, "Consortium A"), submitted an unsolicited indication of interest to acquire Everyday Health for $8.00 per Share in cash.

45.     On April 5, 2016, the Everyday Health Board held a meeting, during which they discussed the Company's business priorities, growth opportunities and industry trends. Qatalyst attended a portion of the meeting to advise the Board amongst other things, the indication of interest received from Consortium A. On April 11, 2015, Everyday Health engaged Qatalyst as an independent financial advisor to Everyday Health to provide general strategic advice, including with respect to interest from third parties. The Board determined to engage in discussions with Consortium A regarding their indication of interest after Everyday Health had announced its financial results for the first quarter ended March 31, 2016, in order to demonstrate more value to Consortium A. The Board determined it was not willing to engage in due diligence until after such time, and given the price of the offer, determined not to agree to exclusivity with Consortium A.

46.     On April 7, 2016, Qatalyst communicated to Consortium A that the Everyday Health Board determined not to pursue the indication of interest at the stated price of  $8.00 per Share and subject to the requested exclusivity and go-shop provision, but that Everyday Health would be willing to prepare responses to diligence inquiries of Consortium A and engage in further discussions after the announcement of Everyday Health's financial results for the first quarter ended March 31, 2016 on May 5, 2016 in order to demonstrate more value.

47.     On April 11, 2016, Everyday Health received the indication of interest from a private equity firm ("Financial C") to acquire Everyday Health for a price between $7.25 and $7.80 per Share in cash.

48.     On April 13, 2016, the chief executive officer of a digital marketing subsidiary of a publicly held pharmaceutical company ("Strategic B"), approached Wolin at an industry

13

conference regarding a potential acquisition of Everyday Health. Wolin referred him to representatives of Qatalyst.

49.     On April 14, 2016, members of Everyday Health management and representatives of Qatalyst held a telephonic meeting with representatives of Financial C and Financial C's investment bankers to discuss Financial C's indication of interest. Representatives of Qatalyst communicated to Financial C that Everyday Health had determined not to pursue the indication of interest at the stated price of between $7.25 and $7.80 per Share, but that management would be willing to prepare responses to diligence inquiries of Financial C and engage in further discussions after the announcement of Everyday Health's financial results for the first quarter ended March 31, 2016 on May 5, 2016.

50.     On April 23, 2016, representatives of Strategic B communicated to representatives of Qatalyst their desire to hold a meeting with Everyday Health management after the announcement of Everyday Health's financial results for the first quarter ended March 31, 2016 on May 5, 2016.

51.     On April 26, 2016, Strategic B entered into a non-disclosure and standstill agreement with Everyday Health. Strategic B agreed not to request a waiver of the standstill, but was not prohibited from requesting a waiver as long as such request would not reasonably be likely to require Everyday Health to publicly disclose such request (the "Don't Ask, Don't Waive" provision), and the standstill restriction did not automatically terminate in the event of Everyday Health's announcement of a strategic transaction (a "Fall-away Provision").

52.     On April 28, 2016, the Company Board met to discuss the indications of interest from the potential interested parties and appointed a transaction committee consisting of Directors Evan, Golden, and Kornwasser (the "Transaction Committee") to assist the Board in reviewing

and evaluating potential strategic alternatives.

53.     On May 5, 2016, the Company announced its financial results for the first quarter ended March 31, 2016.

54.     On May 10, 2016, Company management and Qatalyst met with Strategic B to provide Strategic B management with an overview of the Company's business and respond to diligence inquiries.

55.     On May 11, 2016, each of Strategic A, Financial A and Financial B, individually, entered into a non-disclosure and standstill agreement with Everyday Health, which included the Don't Ask, Don't Waive provision, and did not include a Fall-away Provision.

56.     Also on May 11, 2016, Company management and Qatalyst met with Strategic A and Financial B to provide Strategic B management with an overview of the Company's business and respond to diligence inquiries.

57.     On May 12, 2016, at the suggestion of an investment banking contact, Wolin met with representatives of a private equity firm ("Financial D") in San Francisco, California, during which Financial D expressed an interest in exploring a transaction with Everyday Health. After the meeting, Wolin connected Financial D with representatives of Qatalyst.

58.     At a May 17, 2016, meeting the Board and Qatalyst discussed the status of the discussions with Consortium A, Strategic B, Financial C, and Financial D, as well as discussing with Company counsel additional possible alternatives.

59.     On May 19, 2016, Financial D entered into a non-disclosure and standstill agreement with Everyday Health, which included the Don't Ask, Don't Waive provision, and did not include a Fall-away Provision.

60.     On May 19, 2016, a partner of a private equity firm ("Financial E") contacted an

outside director of the Everyday Health Board regarding a potential interest in pursuing an acquisition of Everyday Health, and this director subsequently notified Wolin of such contact. Wolin then directed Financial E to Qatalyst.

61.     On May 20, 2016, the Transaction Committee met to evaluate the existing strategic alternatives and determined to expand the outreach of Everyday Health in connection with a potential strategic transaction beyond the parties that had already approached Everyday Health in order to gauge market interest in a potential transaction with Everyday Health. The Committee discussed approaching the Company's closest direct competitor, a publicly held healthcare-focused digital media company ("Strategic E"), regarding a potential strategic transaction. However, in light of its position as Everyday Health's closest direct competitor, the Transaction Committee determined that Everyday Health and Qatalyst should delay approaching Strategic E until later in the process at such time, if ever, it became reasonably likely that Everyday Health would be pursuing a strategic transaction. Following this call, Everyday Health management and representatives of Qatalyst developed a list of potential strategic and financial parties to approach.

62.     Between May 26, 2016 and June 6, 2016, Wolin and Qatalyst reached out to six additional strategic parties. Two of these parties, Ziff and a publicly held consulting firm ("Strategic C"), expressed an interest in engaging in discussions with Everyday Health. Another of the six additional strategic parties initially indicated an interest in engaging with the Company regarding a strategic transaction, but ultimately declined to enter into such agreement in order to engage in discussions. The remaining three parties declined interest in pursuing a potential transaction.

63.     On May 31, 2016, Financial C entered into a non-disclosure and standstill agreement with Everyday Health, which included the Don't Ask, Don't Waive provision, and did

not include a Fall-away Provision.

64.     On June 2, 2016, Ziff entered into a non-disclosure and standstill agreement with Everyday Health, which included the Don't Ask, Don't Waive provision, and did not include a Fall-away Provision.

65.     On June 7, 2016, Financial E entered into a non-disclosure and standstill agreement with Everyday Health, which included a Fall-away Provision, and did not include the Don't Ask, Don't Waive provision.

66.     On June 8, 2016, Consortium A indicated to management of Everyday Health that Consortium A was not collectively interested in pursuing a strategic transaction with Everyday Health, but that Financial B, who had participated in the Consortium A proposal, remained interested in pursuing a transaction.

67.     From June 9, 2016 through the end of June 2016, Company management conducted extensive meetings with representatives of each of Ziff, Strategic B, Strategic C, Financial B, Financial C, Financial D and Financial E and each of these parties continued their diligence efforts. Additionally, discussions continued with the Individual Investor regarding a potential minority equity investment in Everyday Health, including the potential structuring of such a transaction as a combination of newly-issued shares purchased from Everyday Health and secondary shares purchased from Everyday Health's existing stockholders.

68.     In late June 2016, the Individual Investor advised Company management that he had been in discussions with the Institutional Investor, and that, based on those discussions, he believed that the Institutional Investor would potentially be interested in making a direct equity investment in Everyday Health. Subsequently, he introduced the Institutional Investor to Wolin and Institutional Investor entered into a non-disclosure and standstill agreement with Everyday

Health, which included the Don't Ask, Don't Waive provision, and did not include a Fall-away provision. Thereafter, Institutional Investor began conducting due diligence on Everyday Health.

69.     On June 20, 2016, Strategic C entered into a non-disclosure and standstill agreement with Everyday Health, which included the Don't Ask, Don't Waive provision and a Fall-away Provision. Upon execution of each of the respective non-disclosure and standstill agreements referenced above, representatives of Qatalyst made the initial Company projections (the "Initial Projections") available to each of Ziff, all constituents of Consortium A, Strategic B, Strategic C, Financial C, Financial D and Financial E.

70.     On June 30, 2016, representatives of Qatalyst sent process letters to each of Ziff, Strategic C, Financial B, Financial C, Financial D and Financial E that requested the submission of preliminary non-binding proposals by July 18, 2016. Strategic B had previously advised Everyday Health that a meeting of Strategic B's board of directors was scheduled to take place after the bid date and that Everyday Health should expect feedback after such date. As a result, a process letter was not sent to Strategic B. Diligence with each of these parties continued into early July.

71.     In early July, Institutional Investor informally advised Everyday Health management that, based on its diligence to date, Institutional Investor would be interested in making a minority equity investment in Everyday Health at a purchase price of between $6.50 and $7.00 per Share.

72.     On July 12, 2016, representatives of Financial D informed representatives of Qatalyst that they did not expect to submit an offer to acquire Everyday Health as a whole, but would be interested in a transaction limited to the non-consumer portions of Everyday Health.

73.     On July 16, 2016, representatives of Strategic C communicated to Wolin that they

were not interested in further pursuing an acquisition of Everyday Health.

74.     As of July 18, 2016, the Company had received three all-cash indications of interest: (1) Financial C for $10.00 per Share; (2) Financial E for $10.00 to $10.50 per Share; and (3) Financial B for $10.50 per Share. Financial B advised the Company that it was not able to lead a transaction to acquire Everyday Health and would need to find an appropriate partner in order to proceed. Additionally, each of Financial D and Ziff indicated to management of Everyday Health that they were not interested in pursuing an acquisition of the entirety of Everyday Health. Ziff expressed that it was only interested in the consumer portion of Everyday Health's business, while Financial D had previously expressed that it was only interested in the non-consumer portions of Everyday Health's business on July 12, 2016.

75.     On July 19, 2016, the Board met to discuss the indications of interest received through the bid process. Qatalyst updated the Board regarding the status of discussions with the various prospective bidders. The Board determined to engage in discussions with each of the bidders that had submitted indications of interest, permit Financial D and Ziff to work together toward submitting a proposal on a joint basis, and instruct Qatalyst to help the Board assess such proposals and other possible transactions.  At this time, the Board also determined to continue discussions with Institutional Investor regarding a potential minority equity investment.

76.     At the conclusion of the meeting, Directors McCormick and Kairouz (the "Rho Directors"), two directors affiliated with Rho Ventures, the Company's largest stockholder, indicated that Rho Ventures may be interested in rolling its Shares into a potential transaction led by a third party, rather than selling all of its Shares as part of a transaction.

77.     On July 21, 2016, Qatalyst discussed with each of Ziff and Financial D the possibility of partnering with each other for a joint acquisition proposal; informed Financial B that

they would be kept in the process, including allowing Financial B to partner with another party for a joint bid; and introduced Ziff to Financial D regarding the possibility of a partnership.

78.     On July 27, 2016, representatives of a publicly held media company ("Strategic D") contacted Wolin, on an unsolicited basis, to express interest in an acquisition of Everyday Health. On July 28, 2016, Strategic D entered into a non-disclosure and standstill agreement with Everyday Health, which included the Don't Ask, Don't Waive provision, and did not include a Fall-away Provision, and began conducting its due diligence.

79.     On July 28, 2016, the Company Board held a regularly scheduled meeting, at which, among other topics, management presented an update on the status of Everyday Health's business, including Everyday Health's preliminary financial results for the second quarter ended June 30, 2016 and management's forecast for the remainder of 2016. Management presented to the Everyday Health Board revised financial projections, which were downwardly adjusted from Everyday Health's previously approved operating budget.

80.     On August 3, 2016, Qatalyst contacted representatives of two other private equity firms, one of which ("Financial F") expressed an interest in a strategic transaction with Everyday Health. On August 9, 2016, Financial F entered into a non-disclosure and standstill agreement with Everyday Health, which included the Don't Ask, Don't Waive provision, and did not include a Fall-away Provision, and began conducting due diligence on Everyday Health.

81.     On August 5, 2016, Everyday Health engaged Cooley LLP ("Cooley"), as outside counsel, to assist Everyday Health in connection with its consideration of strategic alternatives.

82.     On August 10, 2016, representatives of Strategic B communicated to Wolin that they were not interested in further pursuing an acquisition of Everyday Health.

83.     On August 18, 2016, representatives of Strategic D communicated to Wolin that

they were not interested in pursuing an acquisition of Everyday Health.

84.     On August 18, 2016, Qatalyst contacted representatives of Ziff, Financial D and Financial F to indicate a deadline of August 23 for the submission of an offer.

85.     On August 23, 2016, Everyday Health received a joint indication of interest from Ziff and Financial D to acquire Everyday Health for $9.00 per Share in cash.

86.     On August 24, 2016, Everyday Health received an indication of interest from Financial F to acquire Everyday Health for between $9.00 and $9.50 per Share in cash.

87.     On August 24, 2016, the Transaction Committee met, with representatives of Cooley and Qatalyst participating, to discuss the status of the potential strategic transaction as well as the prospects of Rho Ventures rolling its Shares into a potential strategic transaction led by a third party, rather than selling all of its Shares as part of the transaction. Cooley reviewed the fiduciary duties of directors in connection with the consideration of the acquisition proposals, and made recommendations as to how to address potential conflicts related to the interest of Rho Ventures in rolling its equity.

88.     The Transaction Committee concluded that it would be acceptable to introduce Rho Ventures to the prospective bidders to explore such an alternative. Additionally, the Transaction Committee concluded that, as long as Rho Ventures was contemplating rolling its Shares into a strategic transaction, the Rho Directors should be recused from any Everyday Health Board discussions concerning the process.

89.     The Transaction Committee also discussed the existing strategic alternatives and the indications of interests submitted to date, as well as the possibility of making introductions between the remaining bidders in an effort to enhance stockholder value through a joint acquisition proposal. The Transaction Committee instructed Qatalyst to make such introductions and direct

interested parties to submit definitive acquisition proposals.

90.     On August 25, 2016, Qatalyst communicated to each of Ziff and Financial D, on the one hand, and Financial F, on the other, that their prices submitted August 23, 2016 and August 24, 2016, respectively, were significantly lower than other bids received and that in order to progress in the process they would need to significantly increase their bids in any final proposal. Qatalyst also communicated, at the Everyday Health Board's request, to Financial E and Financial B the possibility of partnering for a joint acquisition proposal.

91.     Between August 9, 2016 and October 10, 2016, a full due diligence data room was opened to (1) Financial B, (2) Financial C and (3) Financial E, and their respective representatives, and between August 26, 2016 and October 10, 2016, a full due diligence data room was opened to (4) Ziff, (5) Financial D and (6) Financial F, and their respective representatives, and each of these parties continued their due diligence.

92.     During this time, in person and telephonic due diligence sessions were held with each party, management of Everyday Health, representatives of Qatalyst and Cooley. The updated Company Projections (the "July 2016 Projections") were made available to each of Ziff, Financial B, Financial C, Financial D, Financial E, Financial F and Strategic D. Additionally, due diligence calls and meetings continued with Institutional Investor, who also received access to the due diligence data room.

93.     On September 1, 2016, Qatalyst sent process letters and a draft merger agreement to each of the bidding groups, which included (1) Ziff and Financial D, (2) Financial B and Financial E, (3) Financial C and (4) Financial F, requesting the submission of final bids, fully committed financing letters to the extent required, and comments to the draft merger agreements by the specified bid date of September 23, 2016.

94.     On September 7, 2016, Wolin contacted the chief executive officer of Strategic E to inquire whether Strategic E would be interested in engaging in discussions regarding the acquisition of Everyday Health. On September 8, 2016, the chief executive officer of Strategic E replied to Wolin, indicating that Strategic E was not interested in engaging in discussions.

95.     On September 8, 2016, representatives of Cooley and Harris Beach, PLLC ("Harris Beach"), outside counsel to Ziff, convened a telephone conference to discuss the potential structure of a transaction among Everyday Health, Ziff and Financial D.

96.     On September 8, 2016, Everyday Health received a non-binding expression of interest from Institutional Investor to make a minority equity investment in Everyday Health of up to $50 million, with the expectation that at least $15 million would be invested in a combination of newly issued Shares of Everyday Health and direct secondary purchases from Everyday Health's existing stockholders. The expression of interest was subject to Institutional Investor's continuing due diligence.

97.     On September 9, 2016, at a special meeting of the Company Board, Company management presented another updated set of financial projections prepared for years 2016 through 2020.

98.     After the discussion regarding the revised management projections, Qatalyst joined the meeting and provided a presentation to the Board regarding Everyday Health's valuation that included financial analyses based on the updated projections prepared by Everyday Health management. The Everyday Health Board also discussed the status of discussions with Institutional Investor regarding a potential equity investment in Everyday Health. Following this discussion, the Rho Directors were recused from the meeting and representatives of Qatalyst provided an update on the status of the discussions with the various prospective bidders. The

Everyday Health Board also discussed the potential for Rho Ventures to participate in a strategic transaction. Following the discussion, the Everyday Health Board determined that Everyday Health management should continue discussions with Institutional Investor regarding the terms of a potential equity investment. The Everyday Health Board also determined that Rho Ventures should be introduced to each of the remaining prospective bidders to discuss the potential participation by Rho Ventures along with such parties in a strategic transaction.

99.     On September 14, 2016 and September 16, 2016, each party remaining in the process was separately introduced to Rho Ventures via a call with members of Everyday Health management, which calls were also attended by representatives of Cooley and Qatalyst, respectively, to explore their receptivity to a transaction in which Rho Ventures would participate.

100.     On September 15, 2016, representatives of Financial F contacted representatives of Qatalyst to indicate that it was not able to materially increase the bid price above the initial indication of interest and was not interested in engaging in further discussions.

101.     On September 21, 2016, representatives of Qatalyst spoke with Everyday Health management and recommended delaying the bid date, which had previously been set for September 23, 2016, in response to requests from prospective bidders to receive the preliminary financial results for the third quarter ending September 30, 2016 and an update on Everyday Health's expected fourth quarter 2016 performance. The Everyday Health Board agreed with Everyday Health's management to delay the bid date accordingly.

102.     On September 22, 2016, representatives of Ziff contacted Wolin to notify him that they had decided to pursue the acquisition of Everyday Health independent of Financial D, and on September 24, 2016, representatives of Ziff notified representatives of Qatalyst that they intended to explore an acquisition of all of Everyday Health, rather than only the consumer portion of

Everyday Health's business.

103.     On October 2, 2016, Qatalyst made the revised financial projections, the preliminary financial results for the third quarter ended September 30, 2016 and the Everyday Health's expected fourth quarter performance available to each of the prospective bidders and communicated that the bid date had been extended to October 10, 2016. These revised financial projections were separately and contemporaneously made available to Institutional Investor.

104.     On October 3, 2016, Qatalyst sent process letters to each of (1) Ziff, (2) Financial B and Financial E and (3) Financial C, requesting the submission of final bids, fully committed financing letters to the extent required, and comments to the draft merger agreement by the specified bid date of October 10, 2016.

105.     On October 6, 2016, Company management held diligence calls with each of (1) Ziff, (2) Financial B and Financial E and (3) Financial C to discuss, among other things, financial results for the third quarter ended September 30, 2016 and Everyday Health's expected performance for the fourth quarter of 2016 and Everyday Health's revised projections for years 2017 and beyond.

106.     On October 7, 2016, representatives of Financial B and Financial E communicated to representatives of Qatalyst that they would not be submitting a final bid and that they were no longer interested in pursuing an acquisition of Everyday Health at this time.

107.     On October 10, 2016, two all-cash bids were received: (1) Financial C for $9.50 per Share; and (2) Ziff for $10.50 per Share.

108.     Each of Ziff and Financial C indicated that they would consider permitting Rho Ventures to participate in the transaction, with Ziff proposing that Rho Ventures exchange its Shares of Everyday Health for shares of j2 Global or another mutually acceptable instrument and

Financial C offering Rho Ventures the ability to exchange its Shares of Everyday Health for interests in its proposed acquisition vehicle. Neither the group of Financial B and Financial E nor Financial F submitted bids.

109.    On October 10, 2016, Institutional Investor provided Everyday Health with an updated non-binding proposal to make a minority equity investment in Everyday Health of $15 million to $50 million, with a minimum of $15 million to be invested through the purchase of newly-issued Shares from Everyday Health and the possibility that the additional amount may be used to acquire outstanding Shares from Everyday Health's existing stockholders. In its proposal, Institutional Investor confirmed that it had completed its business due diligence and was prepared to close the investment within the following 10 days, subject only to conducting confirmatory legal diligence.

110.    On October 11, 2016, the Board again held a special meeting, with the Rho Directors recused, to discuss the bids received and to consider whether to proceed with a potential strategic transaction with one of the bidding parties. Qatalyst provided a presentation to the Everyday Health Board regarding the process conducted to date, which included the evaluation of over 30 potential strategic and financial acquirers, of whom 16 were contacted, and the degree of discussions that had been held with each. Qatalyst then provided an overview of the terms of the two final bids and an evaluation of the financial terms of the two proposals, in light of Everyday Health management's projected operating performance. Cooley apprised the Everyday Health Board of certain material terms of the proposed merger agreement delivered by Ziff. During this meeting, management of Everyday Health reached out to Ziff to encourage Ziff and j2 Global to raise their bid price to $10.75 per Share.

111.    Also at this meeting, the Board assessed the relative merits of proceeding with a

strategic transaction compared to continuing as a standalone public company with equity investment from Institutional Investor and executing on its business plan, including the risks and uncertainties related to a standalone approach. After evaluating the relative benefits and risks of the various alternatives, the Everyday Health Board unanimously approved the pursuit of a transaction with Ziff and the entry into an exclusivity agreement in connection therewith.

112.    Subsequent to this meeting, Qatalyst informed Ziff that Ziff's bid was selected for negotiation and presented a seven-day exclusivity period that lasted until 11:59 p.m. Pacific Time on October 18, 2016 on the basis of, among other things, a price of $10.75 per Share. Ziff agreed to proceed on this basis.

113.    On October 16, 2016, Rho Ventures advised Everyday Health that it had determined not to participate in a potential transaction based upon the terms proposed by Ziff. Following this time, the Rho Directors participated in all future discussions of the Everyday Health Board regarding a potential strategic transaction.

114.    On October 20, 2016, Company management and Ziff, together with their respective representatives, met to discuss the Company's stock price and expected financial performance in the fourth quarter of 2016.  Subsequently, Ziff advised Everyday Health that its final bid price was $10.50, below the promised $10.75 level exclusivity was premised on.

115.    On October 21, 2016, the Company Board met, with Company management of Qatalyst, and Cooley present, to consider the proposed transaction with Ziff. At the meeting, Qatalyst gave a presentation containing financial analyses relating to the valuation of Everyday Health and rendered its oral opinion that the Merger Consideration to be received by the holders of Common Stock pursuant to the Merger Agreement was fair, from a financial point of view, to such holders.

116.    After further discussion, the Everyday Health Board unanimously (i) determined that the Merger Agreement and the Transactions, including the Offer and the Merger, are fair and advisable to, and in the best interest of, Everyday Health and its stockholders, (ii) agreed that the Merger Agreement shall be subject to, and the Merger shall be effected under, Section 251(h) of the DGCL, (iii) approved the execution, delivery and performance by Everyday Health of the Merger Agreement and the consummation of the Transactions, including the Offer and the Merger and (iv) recommended that Everyday Health's stockholders tender their Shares to Purchaser pursuant to the Offer, subject to the right of the Board to withdraw or modify its recommendation in accordance with the terms of the Merger Agreement.

117.    On October 21, 2016, prior to the opening of the stock markets in the United States, the parties finalized the Merger Agreement and disclosure schedules, and the Merger Agreement was executed.

**The Proposed Transaction**

118.    On October 21, 2016, Everyday Health announced that it had agreed to be acquired for $10.50 per share in the Proposed Transaction.  The press release reads in relevant part:

> **NEW YORK, October 21, 2016** - Everyday Health, Inc. (NYSE: EVDY), a leading provider of digital health marketing and communications solutions, today announced that it has entered into a definitive merger agreement with Ziff Davis, LLC, a leading digital media company in the technology, gaming and lifestyle categories, which comprises the Digital Media Division of j2 Global, Inc. (NASDAQGS: JCOM). Under the terms of the agreement, Ziff Davis will acquire Everyday Health for $10.50 per share in cash, representing an approximate enterprise value of $465 million. The transaction represents a 28% premium to Everyday Health's unaffected closing share price on October 19, 2016, the trading day prior to media reports that Everyday Health was considering strategic alternatives. It also represents a premium of approximately 57% to Everyday Health's average closing share price over the last twelve months, up to and including October 19, 2016, the trading day prior to market speculation about a potential transaction.
>
> Ben Wolin, Co-Founder and Chief Executive Officer of Everyday Health, commented, "We are pleased to have reached this agreement with Ziff Davis, which

we believe is in the best interests of Everyday Health and our shareholders and represents the culmination of a thorough review of strategic alternatives for the Company. This compelling transaction delivers significant and immediate cash value to our shareholders, and positions Everyday Health to reach its next phase of growth. We look forward to working with the Ziff Davis team to ensure a seamless transition."

**Terms of the Agreement**

Under the terms of the agreement, Ziff Davis will commence a tender offer to acquire all of the outstanding shares of Everyday Health for $10.50 per share in cash followed by a merger in which each remaining untendered share of Everyday Health common stock would be converted into the right to receive the same $10.50 cash per share consideration as in the tender offer. The Board of Directors of Everyday Health unanimously approved the transaction. The Everyday Health Board of Directors received a fairness opinion from Qatalyst Partners and recommends that Everyday Health shareholders tender their shares into the offer. With the assistance of the Company's independent financial and legal advisors, Everyday Health conducted a thorough process to review all options to maximize value for Everyday Health's shareholders.

The transaction is conditioned upon satisfaction of the minimum tender condition, which requires that shares representing more than 50 percent of Everyday Health's common shares be tendered, and is subject to regulatory approvals and other customary closing conditions.

**Advisors**

Qatalyst Partners is serving as exclusive financial advisor to Everyday Health, and Cooley LLP is serving as its legal advisor.

***The Inadequate Merger Consideration***

119.     Significantly, analyst expectations, the Company's strong recent performance, high likelihood of future growth, establish the inadequacy of the merger consideration.

120.     The compensation afforded under the Proposed Transaction to Company stockholders significantly undervalues the Company.  Pursuant to the terms of the Merger Agreement, the transaction values Company stock at approximately $10.50 per share. Significantly, the Company has traded higher than the consideration offered in the Proposed Transaction within the last 52-week, when it traded at $10.57 per share, highlighting the true lack

of a premium present in the Proposed Transaction.

121.    Additionally, a group of six *Yahoo! Finance* financial analysts have valued Everyday Health as high as $14.00 per share, ***a value approximately 33.3% greater than that contained in the Proposed Transaction***.  In addition, several financial firms have set high target values for the Company within the past year, including JPMorgan Chase & Co., who valued the Company at $15.00 per share as recently as November of 2015, a figure that is ***approximately 42.86% higher than the value contained in the Proposed Transaction***.

122.    As previously stated, Everyday Health's true value has not gone unnoticed by those in the media.  For example, on August 2, 2016, Diamond Technology Management penned an article to *Seeking Alpha*, which praised Everyday Health, asserting that the Company was "dramatically undervalued", and that the Company created "a unique health engagement platform which can be monetized through marketing and customized engagement solutions."

123.    In addition, Everyday Health is expected to see an increase in ad revenue in the near future, as an October 20, 2016, *Reuters*, article points out, noting that, "Spending on such ads by pharmaceutical companies, Everyday Health's biggest clients, is expected to grow by more than 12 percent annually, according to data from research firm eMarketer."  Such an increase in revenue only furthers the trend of a Company on the rise with positive future prospects.

124.    Clearly, with many in the financial media praising the Company's financials, and some even calling the pre-merger valuations of the company undervalued, the valuation contained in the Proposed Merger is at unacceptably low levels.

125.    In addition, the Proposed Transaction, due to its nature as a cash-out going-private transaction, will forever foreclose upon Plaintiff and other public stockholders of the Company the ability to see the return on any investment – notable due to Everyday Health's previously

mentioned positive financial outlook.

***Conflicts of Interest***

126.    The process leading up to the Proposed Transaction may have been tainted by the self-interest of certain of the Individual Defendants.  Significantly, Directors McCormick and Kairouz, whom are both affiliated and employed at Rho Ventures, the largest stockholder of the Company, attempted to jump into the sales process on behalf of Rho Ventures.  Notably, this decision was not made until well into the sales process, granting McCormick and Kairouz information that other potential bidders would not have access to at the time of their initial overtures into potential strategic transactions with the Company.  Additionally, Rho Ventures, and therefore McCormick and Kairouz, took such a position for a significant amount of the sales process.  This position, which they held for a substantial portion of the sales process of the Company, is evidence that Kairouz, McCormick, and Rho Ventures sought to use their position to extract greater consideration in any potential strategic alternative for themselves.

127.    Additionally, the sales process conducted by the Board which resulted in the Proposed Transaction was woefully inadequate.  Most notably, while a "Transaction Committee" was ostensibly created to assist the Board in evaluating the Potential strategic transactions, its actual powers and duties are never explained by the Recommendation Statement.  In fact, the Transaction Committee is only mentioned by the Recommendation a handful of times, and is not noted to have met to discuss anything related to the sales process, strategic transactions, or the Proposed Transactions after August 24, 2016, when it introduced Rho Ventures to other interested parties.

128.    This significant absence, including the Recommendation Statement noting absolutely nothing about the Transaction Committee on the day the Proposed Transaction was

approved and executed by the Board, is troubling, and calls into question the unbiased nature of the sales process, and the Transaction Committee's efficacy to advise the Board in a nonbiased manner, especially in a situation in which such non-biased advisement was sorely needed due to the presence of Rho Ventures on the Company Board.

129.    Further evidence of this inadequate sales process can be found in the wildly disparate treatment of competing interested third parties, with some being offered non-disclosure agreements with different terms from one another, and others being offered extensions regarding indication of interest submission deadlines.

130.    Furthermore, certain insiders stand to receive financial benefits as a result of the Proposed Transaction.  Pursuant to the terms of the Merger Agreement, all outstanding and unvested company equity awards to purchase Everyday Health shares, will automatically vest and/or be cancelled in exchange for the Merger Consideration upon consummation of the Proposed Transaction.  Accordingly, company insiders including Directors and Officers may stand to receive large paydays upon the consummation of the Proposed Transaction, tainting their motivations in approving it.

131.    For example, several of the Directors and officers of the Company, own significant portions of Company stock that will be exchanged for millions of dollars upon the close of the Proposed Transaction.  Such large, otherwise illiquid blocks of stock would not normally be able to be so quickly converted into cash, and indicate that the self-interest of these Company insiders, who will benefit apart from the Plaintiff and other common stockholders of the Company, may have tainted the Proposed Transaction.

132.    Specifically, Everyday Health Directors hold large blocks of stock, which will be cashed out upon consummation of the Proposed Transaction, as follows:

| Name | Number of Shares (#) | Cash Consideration for Shares ($) |
|---|---|---|
| **Executive Officers** | | |
| Benjamin Wolin, Chief Executive Officer and Director(1) | 700,021 | $ 7,350,221 |
| Michael du Toit, President(2) | 71,212 | 747,726 |
| Miki Kapoor, President | 36,209 | 380,195 |
| Brian Cooper, Executive Vice President and Chief Financial Officer | 22,186 | 232,953 |
| Alan Shapiro, Executive Vice President and General Counsel | 4,726 | 49,623 |
| **Directors** | | |
| Douglas McCormick(3) | 89,238 | 936,999 |
| Dana L. Evan | 2,008 | 21,084 |
| David Golden(4) | 15,646 | 164,283 |
| Habib Kairouz(5) | 3,944,801 | 41,420,411 |
| Laizer Kornwasser | 3,007 | 31,574 |
| Myrtle Potter | 2,008 | 21,084 |
| Sharon Wienbar(6) | 2,008 | 21,084 |
| **All of our current directors and executive officers as a group (12 persons)** | **4,893,070** | **$51,337,237** |

133.   Notably, the Directors and officers of Everyday Health also hold millions of dollars' worth of illiquid restricted stock options that will instantaneously be converted to the merger consideration upon the consummation of the Proposed Transaction.  Specifically, such insiders hold options and other equity awards as follows:

//

//

//

//

33

| | Cashed Out Options | | | Accelerated RSUs | |
| Name | Number of Shares Subject to Cashed Out Options (#) | Weighted Average Exercise Price Per Share ($) | Cash Consideration for Cashed Out Options ($) | Number of Shares Subject to Accelerated RSUs (#) | Cash Consideration for Accelerated RSUs ($) |
|---|---|---|---|---|---|
| Benjamin Wolin | 657,772 | $7.13 | $          2,213,920 | 168,172 | $1,765,806 |
| Michael du Toit | — | — | — | 82,000 | 861,000 |
| Miki Kapoor | — | — | — | 48,260 | 506,730 |
| Brian Cooper | 331,605 | 7.30 | 1,061,830 | 123,357 | 1,295,249 |
| Alan Shapiro | 151,245 | 8.23 | 342,665 | 59,618 | 625,989 |
| Douglas McCormick | 279,719 | 8.37 | 595,032 | 21,288 | 223,524 |
| Dana L. Evan | 150,332 | 5.94 | 684,935 | 16,375 | 171,938 |
| David Golden | — | — | — | 16,375 | 171,938 |
| Habib Kairouz | — | — | — | 16,375 | 171,938 |
| Laizer Kornwasser | — | — | — | 17,374 | 182,427 |
| Myrtle Potter | 74,644 | 7.63 | 213,996 | 16,375 | 171,938 |
| Sharon Wienbar | — | — | — | 16,375(1) | 171,938 |

134.   Moreover, certain employment agreements with several Everyday Health officers or directors are entitled to severance packages should their employments be terminated under certain circumstances.  These 'golden parachute' packages are significant, and will grant each director or officer entitled to them at the very least, hundreds of thousands of dollars, compensation not shared by Everyday Health common stockholders.

135.   The following table sets forth the Golden Parachute compensation for certain Everyday Health directors and officers:

| Name(1) | Cash(2) | Equity(3) | Perquisites/Benefits(4) | Total |
|---|---|---|---|---|
| Benjamin Wolin | $800,000 | $1,765,806 | $21,134 | $2,586,940 |
| Michael du Toit | $850,000 | $ 861,000 | $11,450 | $1,722,450 |
| Miki Kapoor | $395,000 | $ 506,730 | $10,498 | $ 912,228 |

136.    Thus, while the Proposed Transaction is not in the best interests of Everyday Health stockholders, it will produce lucrative benefits for the Company's officers and directors.

***Preclusive Deal Protection Mechanisms***

137.    The Merger Agreement contains certain provisions that unduly benefit Ziff by making an alternative transaction either prohibitively expensive or otherwise impossible.  For example, the Merger Agreement contains a termination fee provision that requires Everyday Health to pay up to $15,180,000 to Ziff if the Merger Agreement is terminated under certain circumstances.  For example, under one circumstance, Everyday Health must pay this termination fee even if it consummates any competing Acquisition Proposal (as defined in the Merger Agreement) *within 12 months following the termination* of the Merger Agreement.  This termination fee is an amount that will make the Company that much more expensive to acquire for potential purchasers.  The termination fee in combination with the preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

138.    The Merger Agreement also contains a "No Solicitation" provision that restricts Everyday Health from considering alternative acquisition proposals by, *inter alia*, constraining Everyday Health's ability to solicit or communicate with potential acquirers or consider their proposals.  Specifically, the provision prohibits the Company from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider an unsolicited *"bona fide written Acquisition Proposal"* if it constitutes or is reasonably calculated

to lead to a "*Superior Offer*" as defined in the Merger Agreement.

139.    Moreover, the Agreement further reduces the possibility of a topping offer from an unsolicited purchaser.   Here, Defendants agreed to provide Ziff information regarding any "*Superior Offer*" within 24 hours of its receipt in order for Ziff to match any other offer, thus providing Ziff access to the unsolicited bidder's financial information and giving Ziff the ability to top the superior offer.   Notably, Everyday Health is required by the Merger Agreement to provide Ziff with five (5) business days in which to top any submitted "*Superior Offer*".   Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of Ziff.

**The Materially Misleading and/or Incomplete Recommendation Statement**

140.    On November 2, 2016, the Company filed with the SEC a materially misleading and incomplete Recommendation Statement that failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

141.    Specifically, the Recommendation Statement fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.   In particular, the Registration Statement fails to disclose the following information:

        a.    Why there were differences in the non-disclosure agreements ("NDAs") entered into between Everyday Health and the various interested third parties, specifically, the reasoning for the differing structure between Strategic B and

the other interested third party entities and why ten (10) of the twelve (12) NDAs did not include fall away provisions;

b.   Why the market check performed by Qatalyst between May 26, 2016 and June 6, 2016 did not include any prospective financial parties;

c.   Why the Rho Directors were allowed to participate in the discussion regarding the Institution Investor's proposed strategic alternative at the September 9, 2016 Board meeting rather than recusing themselves;

d.   The reason(s) the Company failed to contact 14 of the 30 potential strategic and financial partners listed by Qatalyst on October 11, 2016;

e.   The reason(s) the Company the Company moved forward with Ziff at the price of $10.50 per share after indicating that the negotiations with them were based on a $10.75 per share deal on October 11, 2016;

_Omissions and/or Material Misrepresentations Concerning Everyday Health's Financial Projections_

142.   The Recommendation Statement fails to provide material information concerning financial projections provided by Everyday Health's management, reviewed with Everyday Health and relied upon by Qatalyst in its analyses.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects."  _In re Netsmart Techs., Inc. S'holders Litig._, 924 A.2d 171, 201-203 (Del. Ch. 2007).

143.   Here, the Recommendation Statement fails to disclose:

(a)      Regarding the "July 2016 Projections" and the "Initial 2016 Projections"

tables on pages 27-28, (a) unlevered free cash flows; and (b) reconciliation of GAAP net income to non-GAAP EBITDA, non-GAAP UFCF and non-GAAP Adjusted EBITDA.

(b)     Regarding the "September 2016 Projections," the line items provided to "remaining bidders" as set forth on page 27 of the Recommendation Statement.

144.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

145.     Without accurate projection data presented in the Recommendation Statement the Plaintiff and other stockholders of Everyday Health are unable to properly evaluate the Company's true worth, the accuracy of Qatalyst's financial analyses, or make an informed decision whether to tender their Company stock in the Proposed Acquisition.

*Omissions and/or Material Misrepresentations Concerning Qatalyst's Financial Analyses*

146.     In the Recommendation Statement, Qatalyst describes its fairness opinion and the various valuation analyses it performed to render its opinion.  However, Qatalyst description fails to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinion.

147.     For example, the Recommendation Statement does not disclose material details concerning the analyses performed by Qatalyst in connection with the Proposed Transaction, including (among other things):

Discounted Cash Flow Analysis

      i.     The specific inputs and assumptions used to determine the discount rate range of 8.0% to 12.5% used in this analysis.

    ii.      The implied perpetuity growth rate ranges resulting from this analysis.

    iii.     The definition of unlevered free cash flow utilized by Qatalyst.

    iv.     How stock based compensation was treated in this analysis.

    v.      The estimated debt balance as of September 30, 2016 utilized by Qatalyst.

    vi.     The number of fully-diluted shares used by Qatalyst used in the Qatalyst DCF.

Selected Companies Analysis

    i.      The EV/CY17E Adjusted EBITDA Excluding Capitalized Expenses Multiples for each of the selected companies observed in the analysis (alternatively, at a minimum, a full statistical summary of the data set including Minimum, Maximum, and Mean).

    ii.     The other financial metrics calculated by Qatalyst for each of the selected companies.

    iii.     The criteria used by Qatalyst to select the companies used in this analysis.

    iv.     Whether Qatalyst conducted any type of benchmarking analysis for Everyday Health in relation to the selected companies.

    v.     The conclusions drawn by Mooreland from this analysis, including how this analysis factored its opinion that the Proposed Acquisition is fair.

Selected Transactions Analysis

    i.      The EV/LTM Adjusted EBITDA Excluding Capitalized Expenses Multiple for each of the selected transactions.

    ii.     The EV/NTM Adjusted EBITDA Excluding Capitalized Expenses Multiple for each of the selected transactions.

    iii.     The other financial metrics calculated by Qatalyst for each of the selected transactions.

      iv.  Whether Qatalyst conducted any type of benchmarking analysis for Everyday Health in relation to the selected transactions.

      v.  The conclusions drawn by Qatalyst from this analysis, including how this analysis factored into its opinion that the Proposed Acquisition is fair.

      vi.  The transaction value of each of the selected transactions.

\#.    Without the omitted information identified above, Everyday Health's public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests.  Moreover, without the key financial information and related disclosures, Everyday Health's public stockholders cannot gauge the reliability of Qatalyst's fairness opinion and the Board's determination that the Proposed Transaction is in their best interests.

## CLASS ACTION ALLEGATIONS

148.    Plaintiff brings this action as a class action, pursuant to FRCP 23, individually and on behalf of all holders of Everyday Health common stock who are being and will be harmed by the Individual Defendants' actions, described herein (the "Class").  Excluded from the Class are Defendants and any person, firm, trust, corporation or other entity related to or affiliated with any Defendant.

149.    This action is properly maintainable as a class action.

150.    The Class is so numerous that joinder of all members is impracticable.  As August 3, 2016, Everyday Health had 33,437,337 outstanding shares, resulting in hundreds, if not thousands of stockholders.

151.    There are questions of law and fact which are common to the Class including, *inter alia*, the following:

      a.  Whether the Proposed Transaction is unfair to the Class;

b.  Whether Plaintiff and the other members of the Class would be irreparably damaged were the transactions complained of herein consummated;

c.  Whether Defendants violated Federal laws;

d.  Whether the Individual Defendants are acting in furtherance of their own self-interest to the detriment of the Class;

e.  Whether the Class is entitled to injunctive relief or damages as a result of the wrongful conduct committed by the Defendants; and

f.  Whether Defendants have disclosed and will disclose all material facts in connection with the Proposed Transaction.

152.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

153.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

154.    Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

**FIRST COUNT**

**Class Claims For Violations of Section 14(e) of the Exchange Act**

**Against All Defendants**

155.    Plaintiff repeats all previous allegations as if set forth in full herein.

156.    The Individual Defendants have issued the Recommendation Statement with the intention of soliciting stockholder support of the Merger.

157.    Defendants violated Section 14(e) of the Exchange Act by issuing a Registration Statement that was materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, the Individual Defendants should have known that the Recommendation Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

158.    Defendants knew that Plaintiff would rely upon their statements in the Registration Statement in determining whether to tender her shares pursuant to the tender offer commenced in conjunction with the Proposed Transaction.

159.    The misrepresentations and omissions in the Registration Statement are material to Plaintiff, and Plaintiff will be deprived of her entitlement to make a fully informed decision whether to tender her shares if such misrepresentations and omissions are not corrected prior to the expiration of the tender.

160.    Because of the false and misleading statements in the Registration Statement, Plaintiff is threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

**SECOND COUNT**

**Class Claims for Violations of Section 20(a)**

**of the Exchange Act Against the Individual Defendants**

161.    Plaintiff brings this Exchange Act claim on behalf of himself as individuals and on behalf of all other Everyday Health stockholders.

162.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

163.    The Individual Defendants acted as controlling persons of Everyday Health within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Everyday Health, and participation in and/or awareness of the Company operations and/or intimate knowledge of the false statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

164.    Each of the Individual Defendants were provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

165.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Recommendation Statement, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Recommendation Statement

43

at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.  They were, thus, directly involved in the making of this document.

166.    In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger.  The Recommendation Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

167.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

168.    In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Recommendation Statement purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

## THIRD COUNT

### For Breach of Fiduciary Duties

### <u>Against the Individual Defendants</u>

169.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

170.    The Individual Defendants have violated fiduciary duties of care, loyalty, good faith, and candor owed to Everyday Health stockholders.

171.    By the acts, transactions, and courses of conduct alleged herein, Defendants individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and

other members of the Class the true value of their investment in Everyday Health.

172.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, independence, and candor owed to Everyday Health stockholders because, among other reasons, they failed to take reasonable steps to obtain and/or ensure that Everyday Health stockholders receive adequate consideration for their stock, agreed to restrictive deal protection devices that deter other suitors from making a superior bid for the Company, and caused a materially incomplete and misleading Recommendation Statement concerning the Proposed Transaction to be filed with the SEC.

173.    By reason of the foregoing acts, practices, and courses of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

174.    As a result of the actions of Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Everyday Health's assets and businesses, have been and will be prevented from obtaining a fair price for their Everyday Health common stock, and will not be able to cast an informed vote the Proposed Transaction.

175.    Unless the Court enjoins Defendants, they will continue to breach their fiduciary duties owed to Plaintiffs and the members of the Class, all to the irreparable harm of the members of the Class.

176.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**FOURTH COUNT**

**For Aiding and Abetting Breach of Fiduciary Duties**

**Against the Everyday Health, Ziff, Merger Sub, and j2 Global**

177.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

178.    Everyday Health, Ziff, Merger Sub, and j2 Global have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to Everyday Health's stockholders, and have participated in such breaches of fiduciary duties.

179.    Everyday Health, Ziff, Merger Sub, and j2 Global knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  In so doing, Everyday Health, Ziff, Merger Sub, and j2 Global rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Transaction in breach of their fiduciary duties.

WHEREFORE, Plaintiff demands injunctive relief, in her favor and in favor of the Class, and against the Defendants, as follows:

(a)    Declaring that this action is properly maintainable as a class action, certifying Plaintiff as Class representative and certifying her counsel as class counsel;

(b)    Declaring and decreeing that the Proposed Transaction is unlawful and unenforceable, and rescinding and invalidating any merger agreement or other agreements that Defendants entered into in connection with, or in furtherance of, the Proposed Transaction;

(c)    Preliminarily and permanently enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction;

(d)     Imposing a constructive trust, in favor of Plaintiff and the Class, upon any benefits improperly received by Defendants as a result of their wrongful conduct;

(e)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

(f)     Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands trial by jury of all claims so triable.

Dated: November 11, 2016

**BRODSKY & SMITH, LLC**
Evan J. Smith
240 Mineola Blvd.
Mineola, NY 11501
(516) 741-4977
(516) 741-0626 (fax)

*Attorneys for Plaintiff*